## No. 11,601.

### GEORGE F. HERBER vs. PHILIP THOMPSON.

A mortgage executed in favor of a nominal mortgagee for the purpose of being used as collateral security is not extinguished by the payment of the debt which it secured. The mortgagor can reissue it to another creditor to secure another one of his debts. If the contract is not such as it purported to be, it will not be invalid on that account if it contains all the essentials of another contract, which may be enforced. Thus, in a contract to secure a debt by the delivery of a collateral, the declaration that the pledgee is the owner, when the essentials of a sale are wanting, will not prevent the contract from being construed as one of pledge when all the essentials of this latter contract are present.

A party who already holds pledged property to secure his debt may become, by consent of the parties and his own, the detainer of the pledge for another creditor of the debtor, after the expiration of the contract of pledge, securing his own debt.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*Walter B. Sommerville* and *Charles J. Theard* for Plaintiff, Appellant:

The terms, the language, or the form, used by the parties, and even the name which they may choose to give to a contract, can not change the real character of the contract.

The pledgee may be said to be the owner of the thing pledged, although not owner in the absolute sense of the word. To the extent of the debt, he is for all practical purposes the owner of the thing pledged. He can not, under any circumstances, be compelled to return it, before he has received the whole payment of the principal as well as the interest and costs. C. C., Art. 3164. Renshaw vs. His Creditors, 40 An. 37; Webre, Syndic. vs. Beltran, 47 An., p. 195.

The pledgee may assert his pledge, notwithstanding the fact that he may have claimed the ownership of the thing pledged.

Wolf vs. Wolf, 12 An. 529, and authorities there cited; Herold vs. Stockwell, 32 An. 949; Mechanics' Building Association vs. Ferguson, 29 An. 548, and authorities there cited; Blouin vs. Liquidators, 30 An. 717; Insurance Co. vs. Lozano, 39 An. 321, and numerous authorities there cited.

It is essential to the contract of pledge that actual delivery of the thing given in pledge be made to the creditor. But such delivery is only necessary with respect to corporeal things; as to incorporeal rights, the delivery is merely fictitious and symbolical. C. C., Arts. 3152, 3153.

The delivery need not be made to the creditor himself; delivery to a third person agreed on by the parties is sufficient. C. C., Art. 3162.

Conger, Executor, vs. City, 32 An. 1252; Weems vs. Delta Moss Co., 33 An. 973; Jacquet vs. His Creditors, 38 An. 866; Woodward vs. Railway Co., 39 An. 566; Peters et al. vs. Guano Co., 42 An. 694; Citizens Bank vs. Janin, 46 An., page 995, Succession of Lanaux, Id. page 1036.

Where there was only an agreement to pledge certain collaterals, but no actual delivery at the time, to the creditor or to a third person agreed on by the parties, the contract may be perfected by delivery to the creditor at a subsequent period. By such subsequent actual delivery, not only is the pledge perfected from the date of delivery, but it stands good from the date of the contract. C. C., Art. 3144.

Where promissory notes secured by an act of mortgage, but executed and issued only for use as collateral security, have been returned to the maker after payment of the indebtedness which said collateral was intended to secure, the maker may again reissue same to any other creditor of his, either before or after maturity, and under like conditions as he might transfer or pledge notes primarily executed for value. Levy vs. Ford *et al.*, 41 An. 873, and the numerous authorities cited by the court.

No creditor can invoke the revocatory action and sue individually to annul any contract made before the time his debt accrued. C. C. 1993; 29 An. 513.

51

A contract must be shown to be both simulated or fraudulent, and injurious to the creditor complaining before it can be set aside. If one of these requisites does not exist there is no fraud. The intention to defraud must be proved. 18 La. 388; 2 Rob. 94; 1 An. 42; 1 Rob. 527; 11 Rob. 493, 543; 12 An. 531.

An unfair preference, in the nature of a sale or mortgage, given by the debtor to one of his creditors for an existing debt, is presumed to be fraudulently given. This presumption extends to such contracts only as were given and inscribed within three months previous to the failure of the debtor. C. C. 3359, 3360.

"If a bill is accepted on the promise that a mortgage will be given to secure the acceptor, and it be subsequently given, if the mortgagor fails the date of the promise will be considered in inquiring whether it should be set aside." 2 N. S. 88.

*Wm. S. Benedict, Hugh C. Cage* and *Robt. G. Dugué,* Attorneys for Third Opponents, Appellees:

Fraud and simulation can only be proved by indirect or circumstantial evidence, and when a *prima facie* case has been made out and sufficient facts shown to throw doubt on the validity and good faith of a transaction, the burden is shifted to the parties who know the truth and must establish it. 33 An. 1058, 1072; 38 An. 813.

When notes secured by mortgage return into the hands of the maker, the mortgage becomes extinguished by confusion. Their subsequent reissue, before or after maturity, can not revive the mortgage, particularly to the prejudice ·of third persons, who have acquired rights against the property before such reissue. 4 R. 416; 19 An. 26; 20 An. 263.

A mortgage is looked upon with suspicion when the alleged holder, instead of using his own name to enforce it, uses that of a person interposed, his office boy, and who, when the mortgage is attacked as simulated, fraudulent and void, files technical exceptions through the same office boy, thus attempting to defeat the action. 33 An. 1058.

When a litigant refuses or fails to put upon the stand a person present in court, one of the principals in the transaction which is attacked as simulated and fraudulent, and who knows all the

facts, the presumption is that the testimony of that person would be destructive of his case. 33 An. 1058, 1072; 38 An. 813.

A plaintiff who does not claim all he is entitled to loses the overplus. C. P. 156.

Pledges are *stricti juris*. Delivery and possession are of the essence of a pledge. The debtor's property is the common pledge of his creditors, and no one can acquire a preference over it without the observance of the rules and forms of law.

When a third person is agreed upon to hold property, which is claimed to have been pledged, the pledge is not good, as such, when the third person does not know and agree to hold it as a pledge. If he only agrees to hold it for another, as the property of that other, with or without the knowledge and consent of its former owner, that does not constitute a pledge.

---

Argued and submitted March 1, 1895.
Opinion handed down March 11, 1895.
Rehearing refused May 6, 1895.

---

The opinion of the court was delivered by

McEnery, J. This case was before us in February, 1894, and is reported in the 46th Annual, p. 191. We refer to that case for a full statement of the pleadings. It will be seen by the pleadings that W. S. Parkerson is the real plaintiff, and Herber was the nominal plaintiff interposed by Parkerson. This proof has no bearing on the case other than as one of the links in the chain of evidence to prove the simulation of the mortgage.

The issues before us on this second appeal are whether the mortgage is simulated and fraudulent, having been given by the mortgagor when insolvent; and, if a valid mortgage, was it paid or extinguished so that it could not be revived; whether Parkerson, being the attorney of Thompson, and knowing of his insolvency, could accept the mortgage notes as security for a debt due him by his client.

It follows, as a matter of course, if the mortgage under which Parkerson purchased is null, the adjudication to him is also null and void; and that if it is a valid mortgage he was not required to pay in cash the price of the adjudication, as it was less than his debt.

Hence, there is no necessity for discussing these points presented by third opponents.

The facts show that the mortgage was executed to a nominal mortgagee, for the purpose of being used as collateral security upon which to raise money. It was placed in the hands of and pledged to Captain Murray as collateral security.

There is no question as to the fact of the large indebtedness of Thompson to Murray and that the mortgage notes were placed in his hands as collaterals. The mortgage being thus executed for the purpose of being used as collateral security, it is of no consequence that there was no consideration immediately passing from the mortgagor to the nominal mortgagee. Its use as collateral security gives it value in the hands of the holder the same as though payable to one's own order and by him endorsed and the notes secured by the mortgage transferred to a third party for value.

The evidence does not show that Thompson, the mortgagor, was insolvent. He had asked for a respite from his creditors, and the schedules show a very large excess of assets over liabilities. Respite is evidence only of temporary embarrassment, and often is asked by solvent persons as an indulgence from creditors. There was some attempt to prove that the mortgage was executed for the purpose of securing the mortgaged property from the creditors of Thompson. The testimony is only of loose declarations, such as that the lessee of the property had been told by Thompson and Capt. Murray that the mortgage was all right and that he would not be disturbed during the period of the lease, and a statement of doubtful import that Moore, a debtor of Thompson, had stated that the mortgage was for Thompson's benefit through the interposition of Parkerson, and that Thompson had improved the place and stocked it after the execution of the mortgage.

Moore's statement is not definite and was evidently given in a manner which was in no way intended to affect the validity of the mortgage, as he had signed an agreement in which this mortgage was recognized as valid and binding. There is some effort to show as a reason for the simulation that in the act of pledge of Thompson to Parkerson it was alleged that at the time the mortgage notes were in the hands of Thomas Sefton, president of the Home Insurance Company, and as a fact they were not deposited with him as collateral security by Murray, to whom they were first pledged.

Sefton's testimony is not positive as to the deposit of the collateral, while that of Murray, and the attendant circumstances, leave no doubt of its having been deposited in the insurance company, with other collaterals, by Murray.   We do not appreciate the object of this testimony as to the pledge of the note to Sefton, unless it is intended to impeach the contract of pledge, because Sefton was not the party agreed upon as the detainer of the pledge.   In this view of the case, the matter will be hereafter referred to.

What has been said about the execution of the mortgage at the time Thompson was alleged to be insolvent will apply to the securing of Parkerson's debt by Thompson.   He was not insolvent, as the record shows.   His embarrassment only made it the more imperative upon Parkerson, the attorney, to secure his fee, and other indebtedness.   The amount due Parkerson for services rendered and to be rendered, money advanced on account of litigation, and money loaned to Thompson, and debts paid for him, has not been seriously doubted.   We find no evidence in the record to dispute any of the items which he claims Thompson owes him.   The mortgage was valid, and the debt due to Parkerson by Thompson was a legal and valid obligation.

It is also shown that Captain Murray, who held the notes, was paid in full, all indebtedness for which the mortgage notes were held as collaterals.

Murray's debt was unquestionably extinguished, but the collateral mortgage notes could again be used as collaterals to secure another indebtedness, whether the notes had matured or not, or whether they had come back in the hands of Thompson, and by him delivered to Parkerson, or were directly delivered to Parkerson by Murray, whose debt had been extinguished.   This is no longer an open question, having been definitely settled in the case of Levy vs. Ford, 41 An. 873.

Was Parkerson the legal holder of the note to secure an indebtedness to him?   On this point the record shows the following facts:

In the summer of 1890, Parkerson demanded of Thompson security for his fee.   Certain mortgage notes were to be given to Parkerson. Thompson failed to deliver them, as agreed to between him and Parkerson.   On November 24, 1890, Thompson confessed judgment in favor of Parkerson, which was proved up, and judgment rendered in accordance therewith.   Execution issued on this judgment, and the

net sum of eight thousaud six hundred and thirty-eight dollars and thirty-five cents realized, and credited on the execution. Parkerson, according to his statement, gave Thompson credit for the amount. In March, 1891, Parkerson insisted upon security being given for his debt. The mortgage notes which Thompson had agreed to deliver to Parkerson were on the Waubun plantation, which Thompson had given to Captain Murray, as collateral security for a large debt due by Thompson to him. Captain Murray held both these notes and the mortgage notes in controversy, as collaterals. On March 2, 1891, Parkerson, Murray and Thompson entered into an agreement, in which it was stipulated that the mortgage notes on Grand Couteau plantation, in St. Landry parish, then pledged to Thomas Sefton, to which we have heretofore alluded, were the property of Parkerson, and that after the payment of the amount for which they were pledged, and the crop on the Waubun plantation should be made and realized, the mortgage notes should be delivered to Parkerson. On the reverse of the document, Parkerson signed a statement agreeing that the mortgage notes should not be claimed by him until the making and realizing the second crop on the Waubun plantation, provided Murray would advance for the crops of 1891 and 1892 on said plantation. This agreement is explained in Parkerson's testimony when he says, at that date, March 7, 1891, Murray had no interest in the mortgage, as he loaned the note to him in order to enable him to secure the advances upon the Waubun plantation. It is recited in the agreement to deliver the notes to Parkerson, that they were in the hands of Sefton, president of the Home Insurance Company. Sefton loaned to Moore, owner of the Waubun plantation, and to Murray, to raise crops on said plantation, twenty-five thousand dollars. The note given for the sum was executed by Moore and endorsed by Murray. The money advanced was paid to the insurance company. Murray again got possession of the note.

On 14th January, 1892, Thompson, Moore, Murray and Parkerson entered into an agreement by which John T. Moore assumed the indebtedness of Thompson to Murray in the amount of thirty thousand dollars. Captain Murray was to hold the second mortgage note on the Waubun plantation as his property to secure Moore's indebtedness to him. Murray agreed, after the settlement was effected, to deliver to Philip Thompson whatever collaterals he had belonging to

Herber vs. Thompson.

him.  Parkerson agreed to do all in his power to secure advances for the Waubun plantation so long as Murray continued to advance, and consented that the first mortgage on Grand Couteau plantation, pledged to Thomas Sefton, should be used as collateral security.  By this agreement the debt of Thompson to Murray was extinguished. On February 25, 1893, Murray and Thompson called at Parkerson's office and delivered to him the mortgage notes on the Grand Couteau plantation.

In his reasons for judgment for the intervenors and third opponents, the District Judge says, " prior to March 2, 1891, there was no agreement between Parkerson and Murray to pledge the mortgage notes on the Grand Couteau plantation, or that Murray should hold them, after the payment of his debt, as custodian for Parkerson, as pledgee.  That on said date the notes were held by Murray—pledged to him by Thompson—and that the act of March 2, 1891, was not an act of pledge in accordance with the requirements of the Code. That from the date of the agreement between Parkerson, Thompson and Murray, March 2, 1891, to January 14, 1892, the notes were pledged to Murray for a debt of Thompson; and that by the agreement of 14th January, 1892, the debt was extinguished and paid, and the note, both by the agreement and the operation of law, became the property of Philip Thompson, and that the mortgage notes could not thereafter be reissued.''

Conceding that the agreement of March 2, 1891, did not operate as a pledge of the note to secure Parkerson's indebtedness, there was no seizure of the notes while they were in the hands of Murray, and no right adverse to Parkerson was asserted upon them.  We can therefore, eliminate the agreement from the case, and consider only the delivery of the notes to Parkerson, either by Murray or by Thompson, it is immaterial who delivered them.  There was, when the notes were delivered to Parkerson, a strict compliance with every requisite for a perfected pledge.  The mortgage was executed to be used as collateral security to borrow money.  The debts for which it was pledged became extinguished, and necessarily the security became the property of Thompson.  He owed a debt to Parkerson, and under the authority of the case of Levy vs. Ford, already cited, Thompson could reissue the mortgage notes to him as collaterals.

It is urged as reasons for annulling the act of mortgage that Par-

kerson obtained a confession of judgment from Thompson, and proved up the same, and issued a *fi. fa.* on the same; that he defended suits against Thompson, and fought for delay; that Thompson and Murray both said the act of mortgage was a simulation; that the nominal plaintiff is the office boy of Parkerson, and that Parkerson obtained an unfair preference over other creditors, as the mortgagor was insolvent to his knowledge.

These facts, when shown, are of such a conspicuous character as to discredit the mortgage, and force the plaintiff to proof of its reality. There is no doubt whatever that the mortgage was real, and executed for the purpose of raising money, and that it performed the offices for which it was executed. Parkerson's debt was real, and he had the right to demand security for the same. And after the mortgage notes had done service with one debtor, as collaterals, the creditor had the right to reissue them to another debtor to perform the same service. The record does not show facts sufficient to justify a conclusion that Thompson was insolvent when the notes were pledged to Parkerson. We know of no law which prevents a party who holds pledged property from agreeing to hold the same by the consent of creditor and debtor for the former after the extinguishment of his own debt. The fault found in the document of 2d March, 1891, is that it does not use the word "pledge," but instead of it says that Parkerson is the owner of the notes. There is no inconsistency in claiming as pledgee under this contract, as the pledgee is during the existence of the pledge qualified owner of the pledged property. If the contract is not such as it purports to be, it will not be invalid on that account if it contains all the essentials of another contract which may be enforced. Rhodes vs. Rhodes, 10 La. 85; Wolf vs. Wolf, 12 An. 529.

The written contract of March 2, 1891, contains at least an agreement to pledge. The parties, Thompson, the pledgor; Parkerson, the pledgee, and Murray, the custodian, treated the contract as one of pledge. Murray declared that after the 2d March, 1891, he had no interest, under his former contract of pledge with Thompson, in the notes, and recognized Parkerson's right to control the same, and in the contract or agreement of January 14, 1892, all parties to it recognized Parkerson's right to control the notes and to designate their use as collaterals for supplies. Art. 3144 of the Civil Code says: "If at the time of the contract the debtor had not the own-

ership of the thing pledged, but has acquired it since, by what title soever, his ownership shall relate back to the time of the contract and the pledge shall stand good.'' At the time this contract was made the notes were pledged to Thomas Sefton, out of the control and possession of Thompson. The evidence shows he afterward acquired the possession or control of the notes and delivered them to Parkerson in pursuance of the original contract. The contract of pledge was then completed by the delivery of the thing pledged, and it related back to the time of the first contract and in the language of the article of the Code, the pledge shall stand good.

The intervenor's suits were filed more than a year after this contract of pledge, and Art. 1987 of the Code has application as a bar to the demand of intervenors to set aside the mortgage, because the pledge of the same was made to Parkerson, who knew of the insolvent condition of Thompson.

There has been some confusion in the case by construing the collateral obligation as a primary one, and concluding that it was extinguished by payment and became inert, and no longer an object of further use. Under adjudication in this State, the distinction is clearly drawn. The mortgage having been originally intended for use as the means of borrowing money, by pledging it as collateral security for a primary obligation, the extinction of the latter leaves the collateral mortgage still in existence, subject to be employed in further negotiations. The mortgagor could virtually execute another mortgage on the property for the same purpose and pledge the mortgage notes. Why then cause the useless expense and delay when the mortgage, already executed, can perform the desired service? In fact, if it has not been executed on the mortgaged property, it is not extinguished and will live, unless it expires by prescription, as long as the mortgagor chooses to reissue it. There is no reviving of the mortgage, as it has never been extinguished. Hence a pledgee of such a note as collateral security is entitled to the extent of his debt to all the the rights of a *bona fide* holder, and is for all practical purposes the owner of the note. Mechanics' Building Association vs. Ferguson, 29 An. 548.

This question as to the reissuing of a mortgage note, used as collateral security when returned to the maker after the payment of the mortgage secured by it, is fully discussed in the case of Levy, Jr., vs. Ford, 41 An. 873. In that case the court held that when the

debt was paid and the collateral returned to the maker, he could reissue same to any other creditor, either before or after maturity, under the same conditions that he might transfer or pledge a note primarily executed for value.

It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and it is now ordered that the demand of intervenors and third opponents be dismissed at their costs in both courts.